IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MAGGIE ILIEV and BULL TRANS GROUP, INC., d/b/a Playroom Café, )<br>)<br>Plaintiffs, )<br>)<br>vs. )<br>)<br>ELAVON, INC. and U.S. BANK NATIONAL ASSOCIATION, )<br>)<br>Defendants. ) | Case No. 18 C 8208 |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Maggie Iliev and her company Bull Trans Group, Inc. (collectively Iliev) have sued Elavon, Inc. and U.S. Bank. The defendants have moved to compel arbitration.

### Background

Iliev started a new business—Bull Trans, which does business as Playroom Café—and wanted to be able to accept debit and credit card payments. She decided to obtain a point-of-sale (POS) system for this purpose and met with Michael Dato, an Elavon employee, to discuss payment processing services that Elavon could provide. Dato said that Elavon could provide, in return for various fees, a system that would allow her to process payments, which would result in funds being deposited into a bank account of her choice.

Iliev agreed to obtain a POS system from Elavon. She alleges that Dato told her she would have to submit an application and be approved. He asked for certain

materials regarding Iliev and her company, told her she could e-mail them to him, and said that he would complete an application for her and then e-mail her a link allowing her to sign the application electronically.

Iliev says that on November 17, 2017 she received an e-mail from Dato with a link that said "sign now." When she clicked the link, a web page opened and prompted her to create and enter a password and certain security questions. Once she did this, another web page appeared that, she alleges, "contained solely a blank rectangle white box with a line for an electronic signature," 2d Am. Compl. ¶ 40, and nothing else—no contract or agreement, and no reference to arbitration. Iliev signed as indicated, and shortly after this she alleges she received a text message from Dato saying her application for a POS system had been approved. She says that she never saw or received a written agreement.

Elavon used Iliev's US Bank account to deposit electronic payments. She alleges that transactions for several dates in March 2018 were erroneously deposited into some other business's account. She called US Bank to find out why her account had not received any funds and was told that the POS equipment had been programmed incorrectly. The transactions were ultimately reversed and this time were deposited into Iliev's US Bank account. However, this resulted in certain customers being charged twice, and this second problem was not corrected for several days. Iliev says that angry customers contacted her to complain, accused her of credit card fraud, vowed never to patronize her business again, and posted negative online reviews. They also disputed the payments, resulting in multiple chargebacks to Iliev's account.

Iliev has sued the defendants for violating the Electronic Fund Transfer Act, 15

U.S.C. § 1693; for breaching an alleged oral contract to deposit correctly funds received via the POS system; for negligence; for breach of fiduciary duty; and for breach of the Illinois Consumer Fraud Act. As indicated earlier, the defendants have moved to stay the lawsuit and compel arbitration. They contend that all of Iliev's claims against both defendants arise from the contract they contend she entered into with Elavon. U.S. Bank also contends that her claims against it arise from her account agreement with the bank. Both agreements contain arbitration provisions.

**1.    Claims against Elavon**

The purported agreement between Iliev and Elavon, which bears the title "Company Agreement," contains a term stating that "By signing this document below you are agreeing on behalf of the Company to a mandatory binding arbitration agreement set forth in the TOS and expressly incorporated herein." The terms of service contain a provision stating, in relevant part:

> **Arbitration.** All claims, controversies or disputes between the parties arising out of or related to the Agreement, the schedules to this Agreement or the relationship between the parties will be submitted to and decided by arbitration held in the city and state in which the Company maintains its principal place of business and in accordance with the Commercial Arbitration Rules and Mediation Procedures of the American Arbitration Association . . . .

Terms of Service ¶ 18.6.

There is no question that Iliev's claims against Elavon arise out of their relationship and are therefore within the scope of their alleged agreement. The dispute that the Court must address involves whether Elavon entered into the agreement, of which the arbitration requirement is a part. Arbitration is a matter of contract, and a party cannot be required to submit to arbitration a dispute that it has not agreed to

3

arbitrate. *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986). When there is a dispute over the existence of an arbitration agreement, a court assesses the evidence as it would on a motion for summary judgment, viewing the facts and drawing reasonable inferences in favor of the non-movant, here Iliev. *See Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735 (7th Cir. 2002). If there is a genuine factual dispute, a trial regarding the existence of an agreement to arbitrate under 9 U.S.C. § 4 is required.

The actual link that Dato sent to Iliev expired well before this lawsuit was filed and cannot be recreated. But Dato says in an affidavit that based on Elavon's standard practices, when an applicant like Iliev follows a link like the one he sent her and then creates the necessary password, the "Company Agreement"—which turns out to be the same thing as the customer application—opens electronically. The last page contains two signature lines, and the applicant may add her signature by using her finger or a stylus on a touch screen or by using a computer mouse. Once this is done, a "submit" button appears, and when it is clicked the signed agreement is sent to Elavon.

Iliev gives a different account of what happened. She has submitted an affidavit stating that once she clicked the "sign now" button in the e-mail from Dato, a web page opened that contained only a white box for her signature, and no other documents. She understood this to be an application for a POS system, not an agreement—and she never saw an agreement. She says the signatures that appear on the application/agreement offered by Elavon "are not mine," and she points out that in one particular spot (though, to be sure, not others) it misspells her first name as "Magdalalena" and says she would not have signed something that misspelled her

4

name.

To corroborate Dato's account, Elavon has provided a copy of a text from Iliev to Dato in which she states: "Mike, my e-mail address is incorrect in the application. Do you want me to sign anyway?" Elavon says this confirms that Iliev actually saw the application. Iliev does not deny that she sent this text. She explains it as follows: Dato's November 17, 2017 e-mail to her with the signature link was incorrectly addressed to iliev.magdalena@gmail.com (her actual address is ilievmagdalena@gmail.com); she somehow received it anyway; and after receiving it she texted Dato to tell him that the email address to which he sent the email was incorrect. She says that in her text, she was not referring to the agreement but rather only to Dato's e-mail.

The problem is that the text that Iliev sent Dato, contemporaneously with the relevant events, completely undermines her current account of the events. She didn't tell Dato in the text that he had sent the link to the wrong address; she said that her e-mail address "is incorrect *in the application*." Dato Affid., Ex. C (emphasis added). There is no viable contention that this was simply a slip of the tongue (or the thumbs). Iliev quite unambiguously said her address was wrong *in the application*, not in the e-mail from Dato, and she asked in the same text about signing *the application*. This, combined with Dato's account of the standard practice of Elavon in sending and receiving customer applications, confirms that Iliev had, and saw, a document that told her that by signing, she was agreeing to mandatory binding arbitration. And she did sign; Iliev states that she electronically provided her signature after getting the link from Dato (and she affirms elsewhere that she knew she had to sign in order to get the POS

5

system).

Iliev's after-the-fact denial of the clear import of her own words is insufficient to give rise to a genuine issue of fact regarding the existence of an agreement with Elavon to arbitrate. The Court concludes that Iliev did in fact enter into such an agreement with Elavon. This is true even if she did not read the arbitration clause. *Baumann v. Finish Line, Inc.*, 421 F. App'x 632, 634 (7th Cir. 2011). A person who signs a contract is presumed to know its terms and consents to be bound by them. *Janiga v. Questar Capital Corp.*, 615 F.3d 735, 743 (7th Cir. 2010); *Paper Express, Ltd. v. Pfankuch Maschinen GmbH*, 972 F.2d 753, 757 (7th Cir. 1992). And because it is undisputed that Iliev's claims against Elavon are within the scope of the agreement to arbitrate, those claims must proceed before an arbitrator, not in court.

2.     **Claims against U.S. Bank**

The Court turns next to Iliev's claims against US Bank. The agreement containing the arbitration provision is between Iliev and Elavon—not US Bank—and the undertaking to arbitrate applies to disputes "between the parties," namely Iliev and Elavon. Defendants contend that Iliev is estopped from avoiding arbitration of her claims against the bank because they are interdependent with her claims against Elavon. *See* Defs.' Mem. at 13. But as the Court pointed out to defendants at argument on the motion, defendants cited the wrong legal standard. Under controlling law, specifically *Warciak v. Subway Restaurants, Inc.*, 880 F.3d 870 (7th Cir. 2018), state law, not federal law, governs whether a contract may be enforced by a non-party, *see id.* at 872 (citing *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009)), and defendants have made no effort to establish the requirements for estoppel under Illinois

6

law, in particular detrimental reliance on the part of US Bank. *See id.* Thus US Bank may not require arbitration based on Iliev's agreement with Elavon.

This does not mean, however, that Iliev is entitled to litigate her claims against U.S. Bank in court. The bank alternatively relies on a term in the account agreement for Iliev's business checking account, which states that "In the event of a dispute relating to or arising out of your account or this Agreement, you or we may elect to arbitrate the dispute." Caswell Affid., Ex. B at 15. Defendants do not identify any term of the agreement to which Iliev's claims relate or out of which they arise. They contend, however, that U.S. Bank's only involvement is that it was to receive deposits of Iliev's electronic payments into Iliev's account and that any claims that Iliev is making against the bank thus necessarily involve a dispute relating to her account. Iliev responds that the account agreement does not contemplate any agreements for an electronic payment processing system. This point, however, addresses only whether her claims arise out of the agreement, not whether they relate to her account at U.S. Bank.

It is clear that Iliev's claims against the bank involve the non-deposit of electronic payments into her account, not to mention the duplicate depositing of some customers' payments into the account and the chargebacks resulting from certain customers' cancellation of the incorrectly credited payments. For these reasons, the Court concludes that Iliev's claims against the bank do "relat[e] to" her account and thus must be submitted to arbitration.

## Conclusion

For the reasons stated above, the Court grants defendants' motion to stay the proceedings and compel arbitration [23]. The ruling date of August 7, 2019 is vacated.

7

Because the plaintiff's claims will proceed in arbitration, the Clerk is directed to administratively terminate this case.

Date: July 31, 2019

                                                                           _____
                                                                           MATTHEW F. KENNELLY
                                                                           United States District Judge